No. 01-087

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 233

CURT HIEBERT,

        Plaintiff/Appellant,

    v.

CASCADE COUNTY, a Political Subdivision of the
State of Montana; CASCADE COUNTY SHERIFF
BARRY MICHELOTTI; CASCADE COUNTY
COMMISSIONERS PEGGY BELTRONE, HARRY MITCHELL
and ROY AAFEDT; CITY OF GREAT FALLS; and
INVESTIGATING OFFICER BILL BELLUSCI, and
DEPUTY CASCADE COUNTY ATTORNEY JULIE MACEK,

        Defendants/Respondents.

APPEAL FROM:    District Court of the Eighth Judicial District,
                    In and for the County of Cascade,
                    The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Patrick F. Flaherty, Attorney at Law, Great Falls, Montana

        For Respondents:

                Robert F. James, Cathy J. Lewis, Ugrin, Alexander, Zadick & Higgins, P.C.,
                Great Falls, Montana (Bellusci and City of Great Falls)

                              Submitted on Briefs: March 28, 2002

                                    Decided:   October 17, 2002

Filed:

                                              
                                        Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1    The Petitioner, Curt Hiebert, brought this action for damages pursuant to 42 U.S.C. § 1983 in the District Court for the Eighth Judicial District in Cascade County.  He alleged that the defendants, including Julie Macek and Bill Bellusci, concealed exculpatory information from him during a prior criminal proceeding in violation of his right to due process.  The Defendant Julie Macek and Defendants Bill Bellusci and the City of Great Falls ("the City") filed two separate motions for summary judgment. After striking certain exhibits filed by Hiebert in opposition to the motions, the motions were granted.  Hiebert appeals from the District Court's order granting summary judgment in favor of Defendants Bellusci and the City.  We affirm the order of the District Court.

¶2    There are two issues presented on appeal:

¶3    1. Did the District Court correctly strike the exhibits submitted by the plaintiff in opposition to summary judgment?

¶4    2.  Did the District Court err when it entered summary judgment as a matter of law in favor of Defendants Bellusci and the City?

FACTUAL AND PROCEDURAL BACKGROUND

A.  Hiebert's Prior Criminal Case.

¶5    On July 27, 1996, Great Falls Police Officers Otto, Cameron and Cathel were dispatched to a disturbance at an apartment complex.  The officers arrived at the complex and spoke with then-14-year-old Alaina Coles and her mother Sherry Coles, who told the

2

officers that Curt Hiebert, a neighbor in the complex, assaulted Alaina.

¶6    Otto and Cameron spoke with Alaina and Alaina told the officers that Hiebert, a neighbor and acquaintance of Sherry and Alaina, told Alaina and her cousin Darcie Bourne that he would take them to eat at Burger King sometime later that evening.  Later that evening, Alaina and Darcie returned to Hiebert's apartment to take him up on his offer.  Hiebert told Alaina that he needed to speak with her alone inside.  Alaina went inside and sat down, and shortly after, the alleged assault occurred.

¶7    Cameron's report described the alleged physical contact and sexual assault as follows:

> Alaina also stated that Curt started talking to her sexually, saying things like "I've always liked the way you look".  Alaina stated that *Curt then started rubbing her on the thighs and arms and forced her on to the bed.*  Alaina stated that Curt had her by the arms and was on top of her saying "Everything will be alright."  Alaina stated that Curt then got off the bed and on his knees on the floor and had his head between her legs area.  Alaina stated she tried to convince Curt that she did not want to have sex with him and that she had another boyfriend.  *Curt continued to rub her inner thigh and legs and then allowed her up at which time he hugged her and let her go.*  [Emphasis added.]

¶8    Otto's report describes the alleged physical contact in a slightly different, but consistent manner.  He stated:

> Alaina said they talked for a few minutes [and] then *Curt started rubbing her arm and then her thigh.*  Alaina told us Curt never said what he wanted to do, but she felt uncomfortable and knew he was intending to try and come on to her.  Alaina said Curt then grabbed her arms and knelt in front of her, trying to push her on her back.  Alaina told him no several times and Curt just mimicked what she said.  Finally, Curt let her up and Alaina said she moved near the door.  [Emphasis added.]

3

¶9 After speaking with Alaina, Otto and Cameron spoke with Hiebert, who denied that an assault occurred. Police concluded after their initial investigation and interview with Alaina that there was probable cause to arrest Hiebert for felony sexual assault. Hiebert was arrested, and bail was set in the amount of $25,000, but Hiebert remained in jail until the charges were dismissed over five months later on January 9, 1997.

¶10 After the arrest, Detective Bill Bellusci interviewed Alaina on July 31, 1996, to obtain a statement, and recorded the interview. In the transcript of the interview, Alaina described the alleged assault similarly to the previous reports:

> "[H]e told me to come sit next to hi[m], so I sat next to hi[m], about a foot away from him, I guess, and-then he started hugging on me and saying how much he couldn't resist me and everything and it kindda-I just wanted to get pretty much out of there and-so I said, well, we better go now and everything and he kept saying no, just a couple more minutes and then he knelt down in front of me and he kept saying 'sit down, sit down,' and I was already sitting down and he was trying to push me back and I was trying to stay up and finally I kept saying no, no, no, I can't do this . . . . [F]inally he let me up and he said, well, are you going to give me a hug-or something like that . . . so I gave him a hug 'cause I wanted to leave and then I walked out. . . ."

In the interview with Bellusci, Alaina had the following to say about where she was touched:

> [Q] Okay. Did he touch you anywhere?
>
> [A] On my leg and on my arm.
>
> [Q] What did he touch you with?
>
> [A] Just his hands.
>
> . . . .
>
> [Q] So he didn't touch your breast or your crotch area?

4

[A]  No –

[Q]  Did you ever tell anybody he had tried to do that?

[A]  Yeah, when I left, I told Alisha.

[Q]  What did you tell her–that he tried to do?

[A]  I said that he pinched me in there.  And then I told her the rest of the story later but I was kindda mad.

[Q]  You believe that he was trying to advance on you sexually?

[A]  yeah because he kept saying that it was hard to resist me and he told me before when he was drunk that he loved me and - he kept saying that he couldn't do anything with me because I was underage, I guess, so - and it would be statutory rape but - I wasn't going to do anything anyway.

[Q]  When he touched you on his leg, where did he touch you on the leg[?]

[A]  On the thigh.

[Q]  Did you stop him from doing that?

[A]  How could I?

[Q]  But I mean did you make an attempt to stop him?

[A]  Yeah, I kept saying don't - don't - just leave me alone.

¶11     Bellusci completed the report and attached the transcript of the interview on August 7, 1996, one day after Macek filed formal charges against Hiebert.  In his deposition, Bellusci stated that he submitted the report to his supervisor, who signed it, but according to Macek's deposition, a copy of the report was not then sent to her office.

¶12     On September 19, 1996, the clerk for the public defender made a discovery request from the prosecutor's office, which sought

5

exculpatory material and witness lists. On October 8, 1996, the District Court issued an Omnibus Hearing Order, which required similar disclosures from the prosecution.

¶13 In October 1996, Eric Olson, Hiebert's defense attorney, hired a private defense investigator, Robert Hoxter, to interview Alaina about the alleged sexual assault. Hoxter interviewed Alaina on October 28, 1996, and during the interview Alaina described the physical contact during the alleged sexual assault differently than previous statements. Hoxter summarized Alaina's statements as follows in an affidavit prepared for Hiebert's defense:

> 8. . . . Jane said he began rubbing her leg. (At that point Jane pointed to the outside of her thigh to show me where Hiebert had touched her).
>
> . . . .
>
> 12. I asked Jane if Hiebert ever touched any of her private parts. Jane said, "No." She was asked to describe how she was sitting on the bed. She displayed a closed knee, upright position. I asked Jane if she ever parted her knees before or during the time Hiebert knelt in front of her. She said, "No." I demonstrated with my knees and Jane denied Hiebert ever opened or forced open her knees. She was again asked if he touched any of her private parts and she said, "No."

¶14 In late October, Olson learned from Bellusci of his interview with Alaina and requested a copy of the report and interview from Macek on November 4, 1996. After two production requests and a court order, Olson received a copy of the transcript in late November.

¶15 On November 26, 1996, Hiebert moved to dismiss the charges for lack of probable cause. In support of his motion he submitted an affidavit from Hoxter and portions of the Hoxter interview and the

Bellusci interview transcripts. Two days before the hearing for the motion to dismiss, on January 8, 1997, Macek moved to dismiss the charges, stating that "although probable cause existed to charge the defendant when it was charged, the victim later recanted and there is no longer probable cause to support the charges." The motion was granted January 9, 1997, and Hiebert was released from jail after approximately 166 days in jail.

*B. Hiebert's Current Civil Case.*

¶16  On June 9, 1998, Hiebert filed this action pursuant to 42 U.S.C. § 1983 against several defendants, including Bellusci and the City. Bellusci and the City moved for summary judgment on April 21, 1999. Hiebert filed a brief opposing the motions for summary judgment on July 29, 1999, and attached 24 exhibits with a personal affidavit of Jeff Lynch, Hiebert's attorney, swearing that the exhibits were accurate copies of items received during discovery and his own investigation.

¶17  The 24 exhibits included Otto's and Cameron's police reports, documents filed in the criminal proceeding, an affidavit from Eric Olson regarding discovery materials he received from Macek, and other miscellaneous papers. Bellusci's police report and interview transcript were attached as Exhibit P. At least 6 of the 24 exhibits Hiebert attached were objected to by Bellusci and the City. They moved that they be stricken. These exhibits are:

Exhibit M: A letter from Olson to Hoxter requesting that Hoxter interview Alaina;

7

Exhibit N: An unsigned "attorney memorandum" from Hoxter to Olson recounting the substance of his interview with Alaina;

Exhibit O: A transcript of Hoxter's interview with Alaina;

Exhibit R: A November 4, 1996, letter from Olson to Macek requesting the Bellusci interview tape/transcript;

Exhibit T: An unsigned November 13, 1996, letter from paralegal Sara Whirry to Bellusci requesting a copy of the interview tape; and

Exhibit U: The Motion to Dismiss filed in Hiebert's criminal case by Olson.

¶18 On October 28, 1999, Defendant Julie Macek also moved for summary judgment, which Hiebert opposed by written brief on December 14, 1999. She attached as an additional exhibit the deposition of Bellusci. The District Court judge consolidated the motions for summary judgment and to strike the exhibits and heard oral arguments on each matter. On December 12, 2000, the court granted the motion to strike the exhibits and granted summary judgment in favor of Defendants Macek, the City, and Bellusci.

STANDARD OF REVIEW

¶19 We review a district court's order granting summary judgment de novo, and apply the same criteria considered by the district court, based on Rule 56, M.R.Civ.P. *State ex rel. Smartt v. Commission*, 2002 MT 148, ¶ 9, 310 Mont. 295, ¶ 9, 50 P.3d 150, ¶ 9.

¶20 To prevail by summary judgment, the moving party must demonstrate an absence of any genuine issues of material fact and must also demonstrate that the moving party is entitled to judgment

8

as a matter of law. *Hadford v. Credit Bureau of Havre, Inc.*, 1998 MT 179, **¶ 14, 289 Mont. 529, ¶ 14, 962 P.2d 1198, ¶ 14.**

¶21 If the moving party satisfies its burden of proof, the non-moving party must provide "material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact." *Stuart v. First Sec. Bank*, 2000 MT 309, ¶ 16, 302 Mont. 431, ¶ 16, 15 P.3d 1198, ¶ 16. "[T]he non-moving party must set forth *specific facts* and cannot simply rely upon their pleadings, nor upon speculative, fanciful, or conclusory statements." *Thomas v. Hale* (1990), 246 Mont. 64, 67, 802 P.2d 1255, 1257. If the non-moving party fails to raise a genuine issue of material fact, the court must then determine whether summary judgment is appropriate as a matter of law based on the presented facts. *Scott v. Robson* (1979), 182 Mont. 528, 535, 597 P.2d 1150, 1154.

¶22 We review a District Court's admission or exclusion of evidence for an abuse of discretion. ***Busta v. Columbus Hosp. Corp.* (1996), 276 Mont. 342, 353, 916 P.2d 122, 128.**

¶23 Generally, whether evidence is exculpatory evidence is a mixed question of law and fact. *Bowen v. Maynard* (10th Cir. 1986), 799 F.2d 593, 610. However, when considering an alleged denial of due process, determining whether evidence is material is a question of law. *Sivak v. State* (Idaho 2000), 8 P.3d 636, 641.

## ISSUE 1

¶24 Did the District Court correctly strike the exhibits submitted by the plaintiff in opposition to summary judgment?

¶25 Before reaching the merits of this issue we must first reconcile the parties' conflicting claims regarding which of the 24 submitted exhibits were stricken. Hiebert contends that the district court improperly struck all of the exhibits, including, most importantly, the "Bellusci transcript." Hiebert concludes that the court excluded the Bellusci transcript, based in part on the following quote from the court order:

> Without Plaintiff's Exhibits M, N, O, R, T and U available for consideration by the Court, the Court concludes that there are no genuine issues of material fact presented and Defendants Bellusci's and the City's Motion for Summary Judgment is well taken. *Without Alaina's statements available for consideration by the Court* in the context of this motion, it can not be concluded that any exclupatory [sic] evidence was withheld by these Defendants. If no exculpatory evidence was withheld, there is no claim against these Defendants . . . . [Emphasis added.]

Hiebert interprets the court's reference to "Alaina's statements" to mean that the court excluded all of Alaina's statements, including the one made to Bellusci.

¶26 Bellusci and the City argue that Hiebert is confused and that they only objected to 6 of the 24 exhibits and that the district court properly excluded those 6 exhibits (Exhibits M, N, O, R, T, and U). Their brief notes that **"Hiebert appears to misunderstand which documents the District Court disregarded. For example, he contends that the Bellusci interview should have been considered. However, the City did not object to, nor did the court disregard that document." (Citation omitted.)**

10

¶27 It appears from the plain language of the District Court's order that only Exhibits M, N, O, R, T and U were stricken. We therefore limit our consideration to those exhibits. **When considering these exhibits, the court stated:**

> **Defendants have objected that the exhibits, and specifically Exhibits M, N, O, R, T, and U should be stricken as hearsay . . . .**
>
> **The Plaintiff has responded that attorney Lynch's affidavit merely provides authenticity for the statements which are attached as exhibits. Upon review by the Court, it is clear that Plaintiff relies on the statements attached as exhibits to Lynch's affidavit to raise genuine issues of material fact. The specific statements relied on by the Plaintff [sic] are hearsay and are not admissible into evidence in the form that they are presented to the Court. As such the Court can not consider the facts contained in those hearsay statements for purposes of deciding the Motion for Summary Judgement. The City's and Bellusci's Motion to Strike is well taken. Plaintiffs have simply failed to get sworn statements directly from the witnesses they rely on.**

¶28 Hiebert contends that the District Court should have considered the six exhibits because Bellusci and the City introduced the same exhibits "into the record" through Macek's deposition and that the District Court relied on the excluded documents in other portions of its summary judgment order. Hiebert also contends that the court erred by failing to take judicial notice of the exhibits that were filed or pled in the prior criminal case.

¶29 It is well-settled that during summary judgment proceedings, the parties must limit affidavits to evidence that would be otherwise admissible pursuant to the rules of evidence. Rule 56, M.R.Civ.P. Rule 56(e), M.R.Civ.P., provides four requirements for supporting affidavits:

11

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

¶30 Our past decisions have consistently applied the first admissibility requirement in Rule 56(e) that affidavits must be based upon "personal knowledge," defined as: "[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." BLACK'S LAW DICTIONARY 877 (7th ed. 1999). **We have previously held that "an attorney's affidavit 'is admissible only to prove facts that are within his personal knowledge and as to which he is competent to testify; an affidavit stating what the attorney believes or intends to prove at trial will be disregarded.'"** *Morales v. Tuomi* **(1985), 214 Mont. 419, 424-25, 693 P.2d 532, 535 (quoting 10A Wright, Miller and Kane, Federal Practice and Procedure § 2738 (1983)). We have also held that it is appropriate for a district court to strike statements in affidavits made without personal knowledge and based upon hearsay evidence.** *Eberl v. Scofield* **(1990), 244 Mont. 515, 519, 798 P.2d 536, 538;** *see also Thornton v. Songstad* **(1994), 263 Mont. 390, 398, 868 P.2d 633, 638 ("clearly hearsay" statements are inadmissible for summary judgment proceedings).**

¶31 We have extended the personal knowledge requirement to attached exhibits as well. *Disler v. Ford Motor Credit Co.*, 2000 MT 304, 302 Mont. 391, 15 P.3d 864. In *Disler*, we considered

12

whether the district court erred when it excluded three loan documents attached to a brief opposing summary judgment that did not include any supporting affidavit or sworn discovery response. We excluded the three documents because "without an affidavit or sworn discovery response of a Ford employee with personal knowledge of the genuineness, relevance and contents of the documents, the attachments to Ford's brief were little more than inadmissible hearsay." *Disler*, ¶ 11, (citing *Eberl*, 244 Mont. at 519, 798 P.2d at 538; *Thornton*, 263 Mont. at 398, 868 P.2d at 638).

¶32 Based on Rule 56(c), M.R.Civ.P., and our prior decisions, we conclude that the six challenged exhibits were properly stricken by the District Court because they did not set forth facts within the affiants' personal knowledge, nor was a foundation laid for their consideration based on any exception to the rule excluding hearsay evidence.

¶33 Hiebert contends that the exhibits should nevertheless be considered because the defendants made the exhibits part of the record through Macek's deposition testimony. However, the fact that exhibits are referred to during a deposition does not make them admissible. Macek did not claim any personal knowledge of the six exhibits, nor swear to their authenticity. Her testimony did not establish any foundation for admission of the exhibits.

¶34 Finally, Hiebert contends that the District Court erred when it did not take judicial notice of Exhibit U pursuant to Rule 202, M.R.Evid. Exhibit U, a motion to dismiss in a prior criminal proceeding, is not a form of "law" cognizable pursuant to Rule 202(b)(1)-(11), M.R.Evid. In addition, notice of the "law" in the brief would have been unhelpful for summary judgment proceedings. Only judicial notice of the "facts" in the brief would have

13

**been helpful. Hiebert does not, and could not, contend that judicial notice of the "facts" asserted in Exhibit U was permissible.** *See* **Rule 201(b), M.R.Evid.**

¶35 Accordingly, we affirm the District Court's exclusion of Plaintiff's Exhibits M, N, O, R, T, and U as inadmissible hearsay.

ISSUE 2

¶36 Did the District Court err when it entered summary judgment as a matter of law in favor of Defendants Bellusci and the City?

**¶37 The District Court awarded summary judgment to Bellusci and the City for the following reasons:**

> **Without Plaintiff's Exhibits M, N, O, R, T and U available for consideration by the Court, the Court concludes that there are no genuine issues of material fact presented and Defendants Bellusci's and the City's Motion for Summary Judgment is well taken. Without Alaina's statements available for consideration by the Court in the context of this motion, it can not be concluded that any exclupatory [sic] evidence was withheld by these Defendants. If no exculpatory evidence was withheld, there is no claim against these Defendants and they are entitled to dismissal of the claims against them as a matter of law.**

¶38 Hiebert claims that the Bellusci transcript creates a genuine issue of material fact while Bellusci and the City contend that it does not. Specifically, Bellusci and the City contend that Hiebert's due process claim depends entirely upon his contention that the Bellusci transcript is exculpatory and that Bellusci withheld the transcript from the prosecutor. They claim that Alaina's statements to Bellusci were neither exculpatory nor

14

materially inconsistent with earlier statements given to other officers and that, therefore, failure to produce it did not violate due process, even if Alaina later told an inconsistent story to Hoxter.

¶39 When considering the withholding of exculpatory evidence from the defense, we have recognized the U.S. Supreme Court's holding that suppression of evidence by the prosecution "violates due process when the evidence is material to either guilt or punishment, regardless of the good faith or bad faith of the prosecution." *State v. Thompson*, 2001 MT 119, **¶ 31, 305 Mont. 342, ¶ 31, 28 P.3d 1068, ¶ 31 (citing *Brady v. Maryland* (1963), 373 U.S. 83, 86, 83 S.Ct. 1194, 1196-99, 10 L.Ed.2d 215)**. We have held that to show a *Brady* violation of a defendant's right of due process, three elements must be satisfied: "(1) the evidence at issue must be favorable to the accused, either because it has exculpatory or impeachment value; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) the suppression resulted in prejudice to the accused." *Kills on Top v. State*, 2000 MT 340, ¶ 23, 303 Mont. 164, ¶ 23, 15 P.3d 422, ¶ 23.

**¶40 Generally, evidence favorable to the defendant is exculpatory, and the prosecution has a duty to disclose all favorable information to the defense. *Kills on Top*, ¶ 23. To determine the exculpatory nature of the Bellusci statement, we need to consider the sexual assault statute pursuant to which he was charged. It provides: "[a] person who knowingly subjects another person to *any sexual contact* without consent commits the offense of sexual assault." Section 45-5-502, MCA (emphasis added). "Sexual contact" is defined as "touching of the *sexual or other intimate parts* of the person of another, directly or through clothing, in order to knowingly or purposely: (a) cause bodily injury to or humiliate, harass, or degrade another; or**

15

**(b) arouse or gratify the sexual response or desire of either party."** Section 45-2-101(66), MCA

(emphasis added). We have noted that:

> [T]he policy behind our sexual assault statute is to criminalize and punish sexual or intimate impositions that do not involve penetration; but which express a societal concern for such impositions because they provoke outrage, disgust or shame in the victim.
>
> . . . .
>
> Use of the terms "sexual or other intimate parts" indicates that the legislature did not intend to restrict the crime to a touching of the genitalia of either sex or a touching of a female's breast, but instead intended to give the terms *a broader application* . . . .

*State v. Weese* (1980)*, 189 Mont. 464, 467-68, 616 P.2d 371, 373-74 (emphasis added). In *Weese*, we held that rubbing the belly and chest of a 9-year-old girl fits within the statutory definition. Similarly, we looked favorably upon interpretations from other jurisdictions which focus on the outrage, disgust or shame engendered in the victim, and separately held that the buttocks, hips, and chest of a 7-year-old girl fit within the definition of "intimate parts." *Weese*, 189 Mont. at 468, 616 P.2d at 374 (citing *Matter of David M.* (N.Y. 1978), 93 Misc.2d 548; *Matter of Welfare of Adams* (Wash. 1979), 601 P.2d 995; *State v. Turner* (Or. 1978), 575 P.2d 1007).

¶41 We conclude that Alaina's statements to Bellusci that Hiebert touched her on the thigh but that Hiebert did not touch her breasts or "crotch area" were neither exculpatory nor a basis for impeachment in the complete context of her statement. It is clear from our application of the sexual assault statutes that it was not necessary to prove physical contact with breasts or genitalia (through clothing or otherwise). It is also clear from Otto's and Cameron's police reports that there was no indication or allegation that Hiebert touched Alaina's breasts or genitalia. The reports

16

consistently indicated that Hiebert "rub[bed] her on the thighs and arms" and "rub[bed] her inner thigh and legs," and that Hiebert "rub[bed] her arm and then her thigh." Alaina's statement to Bellusci that Hiebert touched her "on the thigh" is not inconsistent with her statements to Otto and Cameron. Nor, considering the context in which it was reported and without more, was it exculpatory.

¶42 We need not determine, however, whether contact with "the thigh" alone is sufficient to prove sexual assault because, in order to prove that he was denied due process, it was incumbent on Hiebert to demonstrate that the "exculpatory" evidence he claims to have been denied would have been material. **"[E]vidence is material *if there is a reasonable probability that the result would have been different* had the evidence been disclosed to the defense."** *Kills on Top*, **¶ 23 (emphasis added). Cumulative evidence is not considered material evidence.** *See U.S. v. Marashi* **(9th Cir. 1990), 913 F.2d 724, 732-733 (merely cumulative impeachment evidence does not satisfy the** *Brady* **materiality requirement). The materiality of evidence is a question of law.** *Sivak*, **8 P.3d at 641.**

¶43 Bellusci and the City have offered evidence that, even if facially exculpatory, the Bellusci statement was not material. They demonstrated that Bellusci's report was consistent with Otto's and Cameron's reports. They provided an affidavit by Otto who stated that when he asked Alaina to demonstrate where Hiebert touched her, "She responded by placing both hands on her upper, inner thighs." Alaina's statement to Bellusci that Hiebert touched her "on the thigh" was consistent with her responses to Officers Otto and Cameron. Furthermore, Julie Macek, the prosecuting attorney, stated during her deposition that while she considered the Bellusci transcript when reducing and

17

dropping the charges against Hiebert, it was the Hoxter interview that most influenced her decision to reduce or drop the charges against Hiebert. She stated:

> I had a situation where in reviewing the file it appeared as though exactly what this girl said had occurred, which was a sexual assault had happened. However, I had to prove that beyond a reasonable doubt to a jury. I knew that when it comes to these types of cases if you have more than one version of the events then you have a potential problem in front of a jury because what happens is a good defense attorney gets a little kid on the stand and beats them over the head each time that they told the story even one iota different. In this case we had not just her initial statement to the officers, we had her tape recorded statement to Detective Bellusci, and more disturbing we had the statement to Mr. Hoxter. To me that was the more disturbing of the three statements. Not Bellusci. Bellusci was not the recantation I am talking about here. I am talking when she gets interviewed by Hoxter is when I think and believe we had a recantation problem.

In addition, Macek stated that, due to her case load at that time, she had not had the opportunity to review Hiebert's file until Hiebert filed a motion to dismiss the charges. All of this evidence suggests that the Bellusci transcript would not have changed whether charges against Hiebert were dismissed or when Hiebert was released from jail. The Bellusci statement contained statements consistent with those provided to Otto and Cameron, provided no new evidence for the defense, and was cumulative. Otto's and Cameron's reports were sufficient to induce Olson to hire an investigator to assess the veracity of Alaina's statements. That person's investigation led to the critical exculpatory statements by Alaina. Bellusci's earlier disclosure of the statement taken by him would not have changed the outcome or timing of Hiebert's release from jail.

¶44 While the Defendants have produced sufficient evidence that they are entitled to judgment as a matter of law, Hiebert has not presented substantial evidence sufficient to create an issue of fact and thereby avoid summary judgment. Hiebert alleges that the Bellusci statement is exculpatory, yet fails to provide any evidence, other than speculation, that earlier disclosure would have led Macek to dismiss charges earlier. There is little doubt

18

that Macek dropped the charges against Hiebert in light of the Hoxter interview and transcript. Accordingly, Hiebert cannot succeed, as a matter of law, based on the theory that Bellusci negligently suppressed exculpatory evidence.

¶45 We have held that an "intentional suppression of exculpatory evidence by the prosecution is a *per se* violation of due process." *State v. Baker*, 2000 MT 235, ¶ 15, 301 Mont. 323, ¶ 15, 8 P.3d 817, ¶ 15 (citing *State v. Brown*, 1999 MT 133, ¶ 24, 294 Mont. 509, ¶ 24, 982 P.2d 468, ¶ 24). However, Hiebert has similarly failed to demonstrate that Bellusci withheld the transcript intentionally. Bellusci stated in his deposition that he had submitted a copy of the report to his supervisor, and the report shows the supervisor's signature. Similarly, Bellusci testified that he had checked off the box on the police report that requests a copy be sent to the prosecutor. Hiebert has provided no evidence (other than speculative claims that Bellusci lied in his deposition and reports) to demonstrate that Bellusci intentionally withheld this information from the prosecution and/or defense. Speculation is insufficient to avoid summary judgment.

¶46 For these reasons we affirm the District Court's award of summary judgment in favor of Defendants Bellusci and the City.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ PATRICIA COTTER

19